**SUZUKI LAW OFFICES**
Attorneys at Law
Richard J. Suzuki, Esq. No. 021348
Seth Apfel, Esq. No. 032225
2929 E. Camelback Rd. Ste. 224
Phoenix, Arizona 85016
Phone: (602) 682-5270
Fax: 480-907-1571
Attorneys@suzukilawoffices.com

Attorneys for Defendant *Garza*

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| United States of America, | Case No. 2:20-cr-00032-JCC |
| Plaintiff, | |
| vs. | **DEFENDANT JOHNNY ROMAN GARZA'S SENTENCING MEMORANDUM** |
| Johnny Roman Garza, | |
| Defendant | (In custody) |

COMES NOW Defendant, Johnny Roman Garza ("Mr. Garza"), by and through counsel undersigned, herein submits "Defendant Johnny Roman Garza's Sentencing Memorandum" for the sentencing hearing set before the Court for December 8, 2020.

Undersigned counsel has reviewed the Presentence Report (PSR) with Mr. Garza, and Mr. Garza has no objections to the contents and/or findings of that report (though he does object to the recommendation).

In accordance with the statutory sentencing factors set forth in 18 U.S.C. § 3553(a), Mr. Garza respectfully requests that he be given a significant variance below the

guideline range.  Specifically, he respectfully requests that he be sentenced to a term of probation.  Given the particular circumstances of this case, including Mr. Garza's history, acceptance of responsibility, lack of criminal history, family support, and the other factors set forth in 18 U.S.C. § 3553(a)(1)-(7), a sentence of probation will provide sufficient punishment, promote respect for the law, and allow for adequate deterrence, while supervision will assist him in getting his life on track.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Mr. Garza will be sentenced on December 8, 2020, after pleading guilty to Conspiracy to Mail Threatening Communications and to Commit Cyberstalking, an offense in violation of 18 U.S.C. §§ 371, 876, and 2261A.  The offense has a statutory maximum of five (5) years imprisonment with no minimum.  If probation is imposed, it can be for up to five (5) years.

The plea agreement contains no stipulations or recommendations as to the sentence to be imposed.  The plea thus allows a sentence of up to five (5) years to be imposed, but also allows Mr. Garza to argue for a variance, and any appropriate departures or adjustments.

### RECOMMENDATIONS OF THE PSR

The presentence report determined that the total offense level for the instant offense, including enhancements and acceptance of responsibility considerations, is level 20. See ¶¶ 36-45. This includes a base offense level of 18, a two level enhancement for

threatened use of a deadly weapon, a three level enhancement for targeting victims based on race and religion, and a three level reduction for acceptance of responsibility. *Id*. Mr. Garza was determined to be in criminal history category I based on the fact that he has no criminal history. See ¶¶ 46-51. Mr. Garza agrees with these assessments.

Based on a criminal history category I and a total offense level of 20, the applicable guideline range as determined by the PSR is 33 to 41 months. See ¶ 80. Mr. Garza agrees with that assessment.

Based on the above as well as the other factors discussed in the PSR, the PSR recommended 18 months of incarceration for Mr. Garza. Mr. Garza strongly disagrees with the notion that incarceration is appropriate, for reasons discussed below. It appears that the primary basis for the recommendation is the nature of the offense itself and the notion of "general deterrence to individuals who espouse beliefs similar to those promoted by Mr. Garza." PSR recommendation at p. 2.

Notwithstanding the recommendations of the PSR, a more substantial variance, granting Mr. Garza probation, is warranted in this case based on the factors discussed below.

**MR. GARZA'S BACKGROUND**

Mr. Garza's personal background is contained within the PSR, Part C – Offender Characteristics, pgs. 9, ¶ 52 through p. 13, ¶ 78, and that information is incorporated herein by reference.

Mr. Garza is only 21 years old, and has no criminal history. He has a very supportive family, particularly his mother, who has accompanied him for all events related to this case. He is also close with his siblings. He has no children.

Mr. Garza has had to overcome significant challenges in his young life. Notably, his mother had him when she was only 18, and she struggled with mental health issues. Because of instability with both of his parents, he came to live with his grandparents for a time, and they primarily raised him. When his mother finally gained sufficient stability so that he could live with her, in order to do so he had to be removed from his school, and he began attending a new school where he was one of the only white students. This led to him being bullied significantly, which in turn led to his mother pulling him out of school. His mother tried to home school him, but after a year, that stopped, and Mr. Garza was left to figure out how to educate himself, out of school and getting no education at home. As a result, he became largely isolated socially, and stopped getting any formal education at a very young age.

In attempting to educate himself, Mr. Garza began to gravitate towards political groups. Moderate at first, focused on atheism, free market economics, and libertarianism, he began to have online contact with others who began pushing him towards more extreme views. His prior isolation and need to belong left him vulnerable to manipulation by more sophisticated men who could mold his world view to their nefarious purposes by giving him an opportunity for a sense of belonging. As a practical matter, Mr. Garza has himself shown remarkable insight into his own deficiencies that

led to his recruitment (which provides opportunities as discussed below).  Over time, he was radicalized by these men and their groups.

After his arrest in this case, Mr. Garza began seeing a counselor, in part to deprogram him from his prior radicalization, and in part to determine what underlying mental health issues he may have.  He was diagnosed with Bipolar Disorder, a condition that further exacerbated his radicalization and made it far easier for others to manipulate him.  He has since been prescribed medication that has helped.

**MR. GARZA'S POST-ARREST CONDUCT AND REHABILITATION**

From the first moments after his arrest, Mr. Garza underwent substantial and significant changes – the PSR only briefly mentioned his post-arrest activities, which bear more significant emphasis.

Initially, the shock of being in jail had a significant impact in and of itself for Mr. Garza.  Right away, he began to search for something else, focusing on the bible and quickly denouncing his prior views and affiliation with the organization that had led him to the instant offense.  It should be noted that organizations such as AWD (the group at issue in this case) target young men like Mr. Garza for recruitment because they can be easily manipulated and convinced to do the bidding of the organization.

Following his release from custody, it would have been easy for Mr. Garza to either (1) revert back to his troubling views, particularly given the extent of his radicalization; or (2) simply tread water while awaiting the outcome of his case.

However, Mr. Garza from the outset expressed a significant interest in making amends for his actions and in distancing himself from the views he now recognizes as odious.

Mr. Garza's rehabilitation began with counseling following his release. The counseling was recommended by undersigned counsel, but Mr. Garza was enthusiastic about it. This counseling ultimately led to his diagnosis as Bipolar, and also helped to deprogram his prior radicalization.

To his great credit, Mr. Garza did not stop at mere disavowal of his prior views. Instead, he took his newfound widening of perspective and ran with it. He decided, to the extent allowed given his release conditions, that he wanted to learn about the cultural history and past suffering of both the Jewish and black communities. He did this to the best of his ability given limitations on online access and the difficulties the pandemic presented for classroom learning. He had hoped to take in person classes at community college on these topics, but was unable to do so due to the pandemic. He did, however, endeavor to learn all he could about Jewish and black culture and past oppression.

Even after the above, Mr. Garza did not stop. Rather, he continued to press the matter to seek other ways in which he might make amends for behavior of which he is deeply ashamed. He (with the permission of his pretrial services officer) sought to contact other organizations, such as the anti-defamation league, to inquire about putting together a program to help other young men avoid the radicalization and manipulation that ensnared him. Mr. Garza felt, and continues to feel, that he can use his experience to help others by keeping them from becoming involved with hate groups like AWD. He

believes he is uniquely positioned to provide such assistance precisely because of his experience, and he relishes the opportunity. Irrespective of the outcome of the sentencing, he hopes to pursue this – he believes (1) that it will atone for his behavior in this case; and (2) he can make a positive difference in his community and turn a negative event into a positive for the community.

Mr. Garza is also interested in pursuing still more action to atone for his own actions and better his community. Specifically, he authorized undersigned counsel to reach out the assigned AUSA and inquire about the possibility of his providing assistance to federal authorities by sharing his experience in the hope that it will help authorities target hate groups by attacking their recruitment processes. He believes that his experience could be useful to authorities by providing insight as to how he came to be involved and radicalized. He hopes to have the opportunity to provide this assistance following the conclusion of his case.

Mr. Garza's transformation has been remarkable. Over the course of time while this case has been pending, he has gone from a hate-filled white supremacist to a repentant young man determined to use his experience for the greater good and to atone for his actions. Undersigned counsel has been personally impressed by the level of sincerity in the change in Mr. Garza. It should be noted that, to the extent that any defendant has the opportunity, through his pretrial actions, to show a court that he is worthy of an opportunity for probation, Mr. Garza has done that and more.

## THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. §3553 SUPPORT A VARIANCE AND REASONABLE SENTENCE BELOW THE GUIDELINE RANGE

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines are advisory, not mandatory. In other words, the Guidelines are a required *consideration*, but district courts are permitted to tailor a particular sentence in light of other statutory concerns. *Id*. at 239. "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id*. at 239; *see also*, *United States v. Menyweather,* 447 F.3d 625 (9th Cir. 2006).

A district court's discretion under the § 3553(a) factors is quite broad. *See United States v. Sylvester Norman Knows His Gun, III,* 438 F.3d 913, 918 (9th Cir. 2006) (explaining that consideration of § 3553(a) factors "does not necessitate a specific articulation of each factor separately"). The court has broad power to make a reasoned decision on the individualized facts before it. *Rita v. United States,* 551 U.S. 338 (2007).

Here, the recommendations of the PSR seem disproportionate to the facts and circumstances surrounding the offenses committed by Mr. Garza, his criminal history or lack thereof, his more minor role in the offense as compared with his codefendants, and most importantly, his post-arrest behavior.

Looking to the factors to be considered under 18 U.S.C. § 3553(a), as for the nature and circumstances of the offense, no violence was involved. While there was a threat of the use of a weapon, Mr. Garza was not found to have been in possession of any

weapons – it thus appears to have been an empty threat (not that this fact implies it was any less terrifying to the victims). No person was physically harmed, and there does not appear to be any indication that any person was ever in physical danger.

Regarding the history and characteristics of the defendant, Mr. Garza has no criminal history. His personal background and characteristics reveal a young man who was removed from school by his mother at a very young age, and who was socially isolated. The lack of supervision, lack of formal education, and isolation created the perfect storm, leaving a young, impressionable man vulnerable to recruitment by an extremist group who manipulated and used him for their own nefarious ends. Mr. Garza has since shown himself to be a decent young man, working to overcome his past disabilities and mental health issues while enthusiastically working to use his experience for the benefit of the community and to atone for his actions.

With respect for the need to reflect the seriousness of the conduct, promote respect for the law, and provide just punishment, on an individualized basis, Mr. Garza was manipulated by more sophisticated people. He was not the primary actor. While the offense should be treated as serious, it also resulted in no physical harm to any person. Tempting though it may be to condemn the repugnancy of the views espoused by Mr. Garza and his codefendants in committing the offense, care must be taken to avoid punishing thought and speech that most consider repulsive. The offense itself involved the making of a threat towards people – nothing more. Mr. Garza has also shown through his own actions since the offense that he has respect for the law. In fact, he has gone so

far as to offer to assist law enforcement in helping to attack the recruitment tools of similar groups in the future. Given these facts, and the impact that his jail time already had upon him, a probationary term to ensure that Mr. Garza continues this productive path and to ensure that he does not engage in future bad acts constitutes just punishment as well as adequate assurance of societal protection.

In terms of deterrence, Mr. Garza's actions since the offense demonstrate that his brief incarceration was itself sufficient to deter him from future criminal conduct. If deterrence is to be considered on a broader scale, in general, the creation of harsher punishment for hate crimes has done little if anything to deter hate groups from pursuing their illicit and odious ends. To the contrary, hate groups have thrived and expanded considerably in recent years, as have hate crimes, and prosecution of actors often serves as a badge of honor for offenders, a sort of martyrdom. The only demonstrably effective mode of deterrence has always been, and continues to be, education, as shown by Mr. Garza's own transformation. To paraphrase former Senator Bill Bradley, we've gone beyond the point where legislation can effectively combat hate; rather, we are at a point where we must win over hearts and minds, something that can only occur through education.

As noted above, there is no need to protect the public from further crimes by Mr. Garza – he is, in fact, seeking to actively assist the public in preventing similar crimes by offering to help prevent recruitment of others into hate groups. Moreover, a probation term will provide sufficient oversight to monitor Mr. Garza's activities.

Mr. Garza is no longer in need of correctional treatment, as he has shown that he has sought such treatment on his own in a highly successful manner. Probation can provide him with assistance in seeking job training and education.

While this Court may wish to consider the need to avoid unwarranted sentencing disparities among defendants found guilty of similar conduct, in this case, to the extent there might be such a disparity (which is unclear, as no evidence has been presented to indicate a probation sentence would create such a disparity), it would not be unwarranted. Mr. Garza has earned a more lenient sentence with his post-arrest actions, such that if any person is worthy of a more lenient sentence of probation following a conviction for the conduct at issue, it is him.

Considering the totality of § 3553(a), and the possible sentences Mr. Garza could face, a substantial variance is warranted to ensure that Mr. Garza's sentence properly reflects the nature and circumstances of his offenses and the seriousness thereof, to promote respect for the law, to provide just punishment, to afford deterrence, and to meet the other goals of 3553. Accordingly, a sentence of probation is appropriate.

**IV. CONCLUSION**

Based upon the foregoing, Mr. Garza respectfully requests that the Court sentence him to a term of probation. Given the particular circumstances of this case, including Mr. Garza's history, acceptance of responsibility, and family support, the requested sentence will provide sufficient punishment, promote respect for the law, and allow for adequate deterrence.

RESPECTFULLY SUBMITTED this 24th day of November, 2020.

                      **SUZUKI LAW OFFICES**

/s/    *Seth Apfel*
       Seth Apfel, Esq,
       Attorneys for Defendant *Garza*

# CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Honorable Raner C. Collins
Hon. John C. Coughenour
U.S. District Judge
700 Stewart Street, Suite 2310
Seattle, WA 98101

Thomas M. Woods
U.S. Attorney's Office
700 Stewart St, Ste 5220
Seattle, WA 98101-1271

                                      /s/     Seth Apfel
                                             Seth Apfel, Esq,
                                             Attorneys for Defendant *Garza*